IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 2, 2005 Session

## HIMELDA FUENTES GUZMAN v. SALVADOR GUZMAN ALVAREZ

**Direct Appeal from the Chancery Court for Williamson County**
**No. 29126     Donald P. Harris, Chancellor**

---

**No. M2003-02902-COA-R3-CV - Filed July 12, 2005**

---

Husband and Wife were married in Mexico while wife's divorce from her previous husband remained pending. The couple eventually moved to Tennessee. Following a marriage of approximately eighteen years, wife filed for divorce alleging adultery, inappropriate marital conduct, and irreconcilable differences. Husband filed an answer and counterclaim for annulment alleging that the marriage between the parties was invalid due to wife's prior subsisting marriage. Following a bench trial, the court below declared a marriage by estoppel and granted wife a divorce on the ground of adultery. The trial court then distributed the parties' accumulated property and ordered husband to establish a lifetime trust with income to be distributed to wife and the remainder to the parties' children. The parties were granted joint custody of their four children with wife designated as primary residential parent. From this order, wife appeals. For the reasons stated below, we affirm the judgment of the trial court, as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Robert A. Anderson, Nashville, Tennessee, for the appellant, Himelda Fuentes Guzman.

Edward P. Silva, Franklin, Tennessee, and John D. Kitch, Nashville, Tennessee, for the appellee, Salvador Guzman Alvares.

**OPINION**

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This divorce matter hinges on the validity of the marriage between Himelda Fuentes Guzman ("Wife") and Salvador Guzman Alvares[1] ("Husband," or collectively with Wife, "the parties"). The parties were married in Mexico in 1986. At the time of the parties' marriage, Wife was still legally married to Lorenzo Leon Covarrubias ("Mr. Covarrubias"), although a divorce was pending in an appellate court in Mexico. After their marriage, Husband and Wife relocated several times and eventually settled in Tennessee, where Husband developed a successful restaurant enterprise. Following the birth of four children and a marriage of sixteen years, Wife filed for divorce. The parties and several witnesses testified during the six-day bench trial, and most, if not all, of the determinative facts and issues were disputed. After considering the evidence, the trial court issued a Memorandum and Final Decree of Divorce, wherein it found a marriage by estoppel. Consequently, the trial court granted Wife a divorce on the ground of Husband's admitted adultery. Dissatisfied with the trial court's division of property and calculation of child support, Wife has appealed. For the reasons stated herein, we affirm as modified.

Turning to the relevant facts of this case, on April 4, 1982, Wife and Mr. Covarrubias were married in a civil ceremony in Jalisco, Mexico. A church ceremony was scheduled for approximately three weeks later. However, soon after the civil ceremony, Wife and Mr. Covarrubias separated, never took part in the scheduled church ceremony, and never lived together as husband and wife.[2]

---

[1] Although Mr. Guzman is designated as Salvador Guzman Alvares in the style of this case, we will refer to him either as Husband or Mr. Guzman, as that is the name he has used since emigrating to the United States.

[2] Javier Leon, an attorney from Mexico who testified as an expert on the domestic relations laws of Mexico, testified that it is customary in Mexico, at least within the Catholic religion, that parties to a marriage take part in both
(continued...)

Approximately two years later in March of 1984, Wife met Husband, and they began a courtship. On September 25, 1985, Mr. Covarrubias filed for divorce. After Wife was served with process, she went to the local court in Arandas, Jalisco and signed papers consenting to the dissolution of her marriage to Mr. Covarrubias. Wife testified at the trial in the instant case that Jalisco court personnel explained to her that "[she] didn't need to do anything else, that everything had been fixed, and [the marriage to Mr. Covarrubias] was annulled." She also testified that she and Husband discussed her prior marriage to Mr. Covarrubias and the purported annulment. Additionally, numerous other witnesses testified that Husband knew of Wife's previous marriage even before the parties married, but he insisted that "it did not matter." Husband contends that Wife told him only that she was once "engaged." He further claims that he first learned of Mr. Covarrubias and the previous marriage in October of 2002, after Wife brought this divorce action.[3]

On April 2, 1986, the Arandas, Jalisco trial court granted Mr. Covarrubias a divorce upon the ground of abandonment of spousal domicile. Pursuant to the laws of Mexico, the divorce matter was referred automatically to the Supreme Court of Jalisco for review. On March 6, 1987, the Supreme Court of Jalisco entered a decree confirming the divorce. In the decree, the Jalisco

---

[2](...continued)
a "civil" and "church" ceremony. Mr. Leon explained that people, especially in rural sections of the country, do not consider themselves married until they take part in the church ceremony, although, as a matter of law, all that is required is a civil ceremony. According to Mr. Leon's testimony, "[i]n Jalisco, marriage is - - according to custom, marriage is what we would say the religious part." However, both parties concede that taking part in a civil ceremony alone is sufficient to establish a legal marriage.

[3]Husband contends that around the time that Wife filed the present divorce complaint, a family member informed him that Wife was previously married. Husband asserts that he then traveled to Mexico, and it was only after searching the official records that he discovered that Wife was indeed previously married.

Supreme Court included an order that prohibited Wife from remarrying until two years had elapsed from the date the decree was issued.

On August 2, 1986, while Wife's divorce from Mr. Covarrubias was pending review, Husband and Wife were married in Jalisco by means of both a civil and Catholic Church ceremony. By the time the process server attempted to serve Wife with copies of the final divorce papers, Husband and Wife had married and changed residences several times. Consequently, Wife was never served with copies of the final divorce decree, and she testified that she never received these documents until after the filing of the instant divorce action. Rather, Wife was legally notified by publication of the final divorce decree.[4]

Prior to Husband and Wife's marriage, the parties took part in numerous formalities regarding their union. The parties went before their priest and answered a series of questions about their personal history. In a sworn, notarized document used by the Catholic Church, Wife declared that she had not been previously married. This document also indicated that there were no existing impediments to the marriage. Additionally, Wife stated that she was "single" on the parties' marriage certificate. Wife testified, however, that she provided each of the foregoing responses at Husband's direction.

---

[4] The following notation appears on the final divorce decree (through interpreter's translation in trial transcript):

> The process server of this court hereby certifies that it was not possible for me to notify in person the attached documents because the parties did not appear, or changed address in the second instance, and thus were legally notified through the Judicial Gazette number 2856 dated March 7, 1987 pursuant to Article 107 of the code of Civil Procedure, Guadalajara, Jalisco, March 9, 1987.
> I certify the foregoing, signature with the seal, official seal of the Attorney General.

After their marriage, Husband and Wife eventually moved to Tennessee, where Husband became quite successful in the restaurant business. In that time, Husband, along with other members of the Guzman family (collectively, the "Guzman Group"), has operated and owned several restaurants in the Middle Tennessee area. Additionally, he has ownership interests in a grocery store and a Spanish language radio station, as well as various other holdings, real and personal, in the United States and Mexico. During the marriage, although occasionally assisting with the several restaurants, Wife primarily served as homemaker and mother of the parties' four children.

In March of 1995, Wife filed for divorce. In this first complaint for divorce, Wife stated that she had never been previously married. This first divorce action, however, was resolved through an Agreed Order of Reconciliation. In the reconciliation order, the trial court decreed that "the parties may resume living together as husband and wife. . . ." The following year in Mexico, the parties celebrated their tenth wedding anniversary. In the year 2000, Husband and Wife purchased new wedding rings and had them blessed by a priest following a regular service at their local church.

Wife brought the present divorce action in September of 2002, alleging the grounds of adultery, inappropriate marital conduct, and irreconcilable differences. In this complaint, Wife again stated that she was never previously married. Husband filed an answer and counter-claim for annulment based on Wife's prior subsisting marriage. Attached to his answer and counterclaim, Husband provided a copy of the Jalisco Supreme Court decree of divorce between Wife and Mr. Covarrubias. In her answer to the counterclaim for annulment, Wife contended that she had no knowledge of the true state of circumstances surrounding her divorce from Mr. Covarrubias until

Husband filed his counterclaim. Wife was subsequently granted leave to amend the provisions of her complaint concerning the number of her previous marriages. Following a trial on the merits, the court below declared a marriage by estoppel and granted Wife a divorce on the ground of adultery. From this order, Wife appeals.

## II. ISSUES PRESENTED

On appeal, Wife and Husband both present several issues. Upon consideration of their respective arguments and issues presented, we perceive the issues as follows:

(1) Whether the trial court erred in declaring a marriage by estoppel;

(2) Whether the trial court erred in its division of property;

(3) Whether the trial court's order requiring Husband to establish a lifetime trust for the benefit of Wife with the remainder to the parties' children was an impermissible award of alimony *in futuro*;

(4) Whether the trial court erred in its calculation of child support; and

(5) Whether the trial court erred in awarding Wife her discretionary costs.

## III. STANDARD OF REVIEW

Our standard of review of a trial court sitting without a jury is *de novo* upon the record. Tenn. R. App. P. 13(d) (2004); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). A presumption of correctness attaches to the trial court's findings of fact, unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d). However, we review the trial court's

conclusions of law under a pure *de novo* standard without any presumption of correctness. *Id*.;

*Bowden v. Ward,* 275 S.W.3d 913, 916 (Tenn. 2000).

> Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, the weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.

*In re Conservatorship of Moore*, No. W2004-01828-COA-R3-CV, 2005 WL 729185, at *2 (Tenn. Ct. App. 2005) (*no perm. app. filed*) (citing *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997)).  Thus, we will not re-evaluate the trial court's assessment of a witness's credibility absent clear and convincing evidence to the contrary.  *See Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

## IV. DISCUSSION

### A. *Marriage by Estoppel*

In support of its conclusion that the facts of this case warranted the application of marriage by estoppel, the court below made findings stated, in pertinent part, as follows:

> The parties were married in a civil ceremony on August 2, 1986.  On the same day, as is the custom for members of the Catholic Church in Mexico, the parties were married before a priest in a Catholic Church in Degollado, Jalisco, Mexico.

-7-

The challenge to the validity of this marriage relates to an earlier marriage between [Wife and Mr. Covarrubias] on April 4, 1982, in a civil ceremony at San Jose de la Paz, Jesus Maria, Jalisco. While [Wife] and Mr. Covarrubias were married in the civil ceremony, a church ceremony was scheduled for days later to coincide with the church wedding of a relative of [Wife]. Between the civil ceremony and the scheduled church ceremony, the couple had a falling out with the result that the church wedding never took place. Mr. Covarrubias and [Wife] separated immediately after the civil ceremony and never lived together as man and wife.

On September 24, 1985, [Mr. Covarrubias] filed for divorce. [Wife] received notice of an action to terminate the marriage. *She went to the court in Arandas, Jalisco and was told by court personnel that her marriage would be annulled.* On April 2, 1986, the Court of First Justice, Arandas, Jalisco, granted the divorce and sent the proceedings to the Supreme Court of Jalisco for final review. On March 6, 1987, a final judgment was entered containing a further legal impediment ordering that [Wife] not enter into a new marriage for a period of two years.

There is no evidence [Wife] received copies of either the granting of the divorce or the final judgment. To the contrary, there is evidence indicating court documents were mailed to an address she had vacated. *The court does not find [Wife] acted in bad faith in believing her marriage had been annulled and that she was free to marry [Husband]*.

While this marriage is subject to being nullified in Mexico, that fact does not necessarily dictate how the courts of Tennessee will view the relationship between the parties. The case is now before the court upon a divorce bill filed by [Wife] alleging adultery on the part of [Husband], an allegation he has admitted. There is no evidence and there has been no suggestion [Wife] has been unfaithful to her marriage vows. The parties have been married for 18 years. During that time, four children have been born of the union. The parties, who were not wealthy at the beginning of the marriage have become so.

The court is satisfied that *both parties thought their marriage legal at the time it occurred.* While there is some evidence [Husband] knew of [Wife's] prior marriage, *there is no evidence either party knew it subsisted at the time their wedding took place*. To deny [Wife] property rights she acquired as a result of this union would be especially unfair where [Husband] is the guilty party in the marriage and yet is attempting to have the court punish [Wife] for her *mistaken belief regarding the annulment of her marriage to Mr. Covarrubias.*

. . . .

-8-

Based upon the circumstances of this case, the court will presume a valid marriage and the parties should be estopped from denying the validity of their marriage to one another. . . . (emphasis added).

"Tennessee has long recognized Marriage by Estoppel where 'the parties have believed in the validity of their marriage and have evidenced that belief with cohabitation.'" *Stovall v. City of Memphis*, No. W2003-02036-COA-R3-CV, 2004 WL 1872896, at *4 (Tenn. Ct. App. Aug. 20, 2004) (*no perm. app. filed*) (quoting *Martin v. Coleman*, 19 S.W.3d 757, 760 (Tenn. 2000)); *see also Hale v. State*, 164 S.W.2d 822, 823 (Tenn. 1942); *Johnson v. Johnson*, 41 Tenn. ( 1 Cold.) 626, 1860 WL 3105, at *2–4 (1860). Generally, the courts of this state have limited the application of marriage by estoppel to circumstances where the party who is seeking to invoke the doctrine has attempted to comply with the statutory requirements of marriage. *See Rambeau v. Farris*, 212 S.W.2d 359, 361 (Tenn. 1948). However, the doctrine may not be invoked by parties who knowingly enter into an invalid marriage, *Stovall*, 2004 WL 1872896, at *5, or "where the parties knowingly live together in an unmarried state." *Martin*, 19 S.W.3d at 760 (citing *Crawford v. Crawford*, 277 S.W.2d 389, 392 (Tenn. 1955)). Lastly, as the doctrine involves a fact-intensive inquiry, marriage by estoppel has been said to apply in "exceptional cases." *Id*.

Husband insists that this is not a proper case for the application of marriage by estoppel. Husband argues that Wife's marriage to Husband is void because it was contracted before the dissolution of her marriage to Mr. Covarrubias. Therefore, as the argument goes, the marriage is invalid, and there could be no marriage by estoppel. Husband cites a number of cases, which he contends support this proposition. *See Pewitt v. Pewitt*, 240 S.W.2d 521 (Tenn. 1951); *Sellers v.*

*Davis*, 12 Tenn. (4 Yer.) 503, 1833 WL 1124 (1833); *Decker v. Meriwether*, 708 S.W.2d 390 (Tenn. Ct. App. 1985); *Falk v. Falk*, No. M2003-02134-COA-R3-CV, 2005 WL 127077 (Tenn. Ct. App. Jan. 21, 2005) (*no perm. app. filed*); *Emmit v. Emmit*, No. E2004-00201-COA-R3-CV, 2005 WL 428290 (Tenn. Ct. App. Feb. 24, 2005) (*perm. app. pending*). However, each of the cases cited by Husband is distinguishable on its facts from the case at bar.

In *Pewitt*, marriage by estoppel was not applicable because the purported wife in that case knew throughout her second marriage that she had never obtained a divorce from her previous husband. *Pewitt*, 240 S.W.2d at 522–24. In *Sellers*, the purported husband was lawfully married to a woman in another state without the purported wife's knowledge. *Sellers*, 1833 WL 1124, at *1. Therefore, the court in *Sellers* determined that the purported husband was without authority to transfer a gift made to the purported wife from her father because the gift was deemed to vest solely in the wife due to the resulting invalidity of the parties' marriage. *Id*. at 2. Once again, neither party was in a position to assert marriage by estoppel, and there is nothing to indicate that it was considered by the *Sellers* court. *Id*. Husband also relies on this Court's statement in *Decker* that "[t]he prior subsisting marriage prevents the establishment of a valid subsequent marriage and thus there could be no marriage by estoppel." *Decker*, 708 S.W.2d at 392. However, in *Decker*, the purported husband and wife never took part in a formal marriage ceremony. *Id*. Thus, *Decker* was not a case where marriage by estoppel could be established.

Husband also insists that this case is controlled by our more recent decisions in *Falk* and *Emmit*. In *Falk*, however, the purported wife possessed full knowledge of the subsisting nature of

her previous marriage. *Falk*, 2005 WL 127077, at *1. Additionally, there is nothing to indicate that the parties in that case argued the issue of marriage by estoppel. While, in *Emmit*, this Court found that the purported wife was not estopped to deny her second marriage based on a mistaken belief in the annulment of her first marriage, *Emmit*, 2005 WL 428290, at *1, we believe that the facts present in *Emmit* did not present the "exceptional" circumstances where marriage by estoppel is applied. *See Martin v. Coleman*, 19 S.W.3d 757, 760 (Tenn. 2000); *Stovall v. City of Memphis*, No. W2003-02036-COA-R3-CV, 2004 WL 1872896, at *4–5 (Tenn. Ct. App. Aug. 20, 2004) (*no perm. app. filed*).

We believe, however that, under the unique facts of this case, the trial court appropriately found a marriage by estoppel. In this case, Wife initially believed that her marriage to Mr. Covarrubias never legally existed. In response to questioning regarding why she stated in her two complaints for divorce that she was never previously married, Wife testified that she "always felt" that her marriage to Husband was her first, that she did not "count [the marriage to Mr. Covarrubias] as a marriage because it was never fulfilled," that she did not remember that she had been married, and that she did not consider herself married "according to [their] custom." The uncontroverted testimony of Wife is also that court personnel in Jalisco informed her that her marriage to Mr. Covarrubias had been annulled and that she would need to take no further action.[5] Additionally, the trial court found that Wife, in good faith, believed that her previous marriage had been annulled.

---

[5]Wife's testimony was admitted at trial over an overruled hearsay objection by counsel for Husband. Husband insists that this statement made by the court personnel was hearsay and not properly admissible. However, we believe that this statement was not hearsay. It was not being offered for the truth of the matter asserted but, rather, for its effect on the listener. Whether the statement was true or not, it was being offered to show that Wife believed her prior marriage to be annulled, and the trial court so found.

Without receiving actual notice that there was in fact a pending review of the divorce decree, Wife and Husband participated in a civil and Catholic Church wedding ceremony, per the custom in Mexico. The responses provided by Wife on the marriage certificate, the Catholic Church marriage application, and in her two complaints for divorce are consistent with her belief that her previous marriage to Mr. Covarrubias had been annulled. Following their marriage, Husband and Wife eventually relocated to Tennessee, where they have been married for eighteen years and have raised four children.

In addition, the evidence in the record supports the trial court's finding that, although Husband may have known of Wife's prior marriage, neither party knew that her previous marriage subsisted at the time their wedding took place. Both parties were proceeding under a mistaken belief that Wife's prior marriage had ended in an annulment. Likewise, the record supports the trial court's finding that both parties believed that they were free to marry and that both parties thought their marriage legal at the time it occurred. Moreover, the parties twice reaffirmed their marriage through a reconciliation in 1995 and later by a blessing of their newly purchased wedding rings in 2000. Accordingly, we conclude that the exceptional circumstances of this case support the trial court's finding of a marriage by estoppel. Having determined that there is a factual basis for applying marriage by estoppel and Husband has admitted to committing adultery, the record supports the trial court's granting of a divorce to Wife on the ground of adultery.

### B. Distribution of Property

Before we begin our discussion of the property issues in this case, we believe that it is helpful to restate some well-settled principles of our divorce law with respect to issues concerning the distribution of property:

> In an action for divorce, Tennessee, as a "dual property" state, draws a distinction between separate and marital property. *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). Because the Tennessee statutes only allow for the division of marital property upon the dissolution of a marriage, it is of primary importance for the trial court to classify property as separate or marital. Tenn. Code Ann. § 36-4-121(a)(2001); *Brock v. Brock*, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996). Therefore, because separate property is not subject to division in an action for divorce, the trial court must initially determine the nature of the parties' property. *Watters v. Watters*, 959 S.W.2d 585, 588 (Tenn. Ct. App. 1997); *Brock*, 941 S.W.2d at 900.

*Eldridge v. Eldridge*, 137 S.W.3d 1, 12–13 (Tenn. Ct. App. 2002).

"Separate property" is defined by statute as follows:

> (A) All real and personal property owned by a spouse before marriage;
> (B) Property acquired in exchange for property acquired before the marriage;
> (C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);
> (D) Property acquired by a spouse at any time by gift, bequest, devise or descent;
> (E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and
> (F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2) (2001). In addition, the Tennessee legislature has defined "marital property," in relevant part, as follows:

> (1)(A) "Marital Property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing a complaint for divorce. . . .

Tenn. Code Ann. § 36-4-121(b)(1)(A) (2001).

In the Final Decree of Divorce, the trial court set out in table format the property owned by the parties. After valuing the parties' total property at $4,121,500.00 after debt, the trial court began its distribution of property. In what clearly appears to be a division of the marital estate, the trial court awarded Wife the parties' marital residence in Franklin, Tennessee, along with all household furnishings. She was also awarded the parties' 1999 Toyota Sienna van. Wife was also ordered to assume all indebtedness on the house and the van, as well as any other debt incurred since the date of the temporary support order, November 19, 2002.

In addition to the foregoing, the trial court ordered Husband to fund a trust that would grant a life estate income interest to Wife. (Id.). Specifically, the trial court ordered as follows:

> Mr. Guzman shall pay to or for the benefit of Mrs. Guzman the sum of Six Hundred Thousand Dollars ($600,000). Fifty Thousand Dollars ($50,000) shall be paid directly to Mrs. Guzman within thirty (30) days from the entry of the decree. Within one year from the entry of the decree, Mr. Guzman shall pay into a "Guzman Family

-14-

Trust" the remaining Five Hundred Fifty Thousand Dollars ($550,000). The trust will be established by the parties with an independent trust company or the trust company at a state or federal bank. . . . After deducting trust fees and expenses, all income from the trust, including capital gains realized from the securities sold, will be paid to Mrs. Guzman during her lifetime. Upon the death of Mrs. Guzman, the corpus of the trust shall be divided equally between the parties' children. The corpus of the trust will not be invaded for any purpose without the written approval of Mr. Guzman or this court. . . .

After awarding Wife her division of the marital estate, the trial court found that Wife had received certain personal property as a gift and awarded Wife as her separate property sundry items of furniture, silverware, jewelry, and any personal effects located in the parties' residence in Mexico. Husband was awarded all remaining property and ordered to assume responsibility for all indebtedness not specifically assigned to Wife.

Wife argues that the trial court erred by not awarding certain items of property, both tangible and intangible, to Wife as her separate property. Wife also takes issue with the trial court's division of the parties' marital estate. Husband contends, however, that, because the parties were not validly married, the trial court erred in awarding Wife any property under a theory of equitable division of marital property. Further, Husband insists that Wife cannot claim an interest in the parties' marital property under a theory of marriage by estoppel because, as Husband argues, estoppel may not create rights in marital property, which is purely a creature of statute. In light of our decision that this case warranted the application of the doctrine of marriage by estoppel, such a finding justifies the distribution of property according to the statutes that apply in the dissolution of a marriage.

Turning first to Wife's issue concerning her "separate" property, Wife first claims an interest in the stock in Mexicana Corporation ("Mexicana Corp."), an Alabama restaurant corporation established by Husband and his two sisters. Husband testified that he placed one-half of his twenty-five (25%) percent ownership interest in Mexicana Corp. into Wife's name, thereby granting Wife a twelve and one-half (12.5%) percent interest in Mexicana Corp. However, Husband contends that Wife's name was provided on the corporate documents only because of legal restrictions related to securing a liquor license.[6] The record reflects that Wife initially believed that she was signing a liquor license. However, the record shows that the parties received checks in Wife's name from the operation of Mexicana Corp., and those monies were deposited into the parties' joint checking account. Also, neither party asserts that they have directly participated in the management or direction of Mexicana Corp. Despite indicating in its Memorandum and Final Decree of Divorce that Wife held a 12.5% ownership interest in Mexicana Corp., the trial court did not award this interest to Wife as her separate property. However, in its table of properties, the trial court also indicated the percentage of each of Husband's ownership interests in the other businesses. There is nothing in the record to demonstrate that Wife in fact held this 12.5% in Mexicana Corp. as her separate property. Rather, the record clearly reflects that this property was acquired during the parties' marriage. As such, we conclude that the trial court did not err in determining that this property was marital property and not Wife's separate property.

---

[6]Apparently, Mexicana Corp. was originally owned by Husband and two brothers-in-law as La Hacienda Mexican Restaurants, Incorporated. However, in 1994 or 1995, the partners lost their liquor license. Husband testified that he and his partners later established Mexicana Corp., with Wife and Husband's two sisters as owners.

Next, Wife contends that the trial court erred in not awarding to her as her separate property a twenty-five (25%) percent interest in S.G. Communications, LLC ("S.G. Communications"), Husband's spanish-language radio station. Wife claims that, by listing Wife as a member of S.G. Communications and assigning to her a 25% interest in the LLC, Husband made a gift to Wife of an interest in the LLC. Further, Wife directs our attention to the fact that she is a signatory to the operating agreement, and, by its terms, she is entitled to 25% of the capital assets upon liquidation of S.G. Communications. Additionally, Wife notes that she is also a signatory to the note that financed the purchase of the initial assets of the LLC, and Husband never secured a release from Wife of her interest in the LLC. Husband, on the other hand, asserts that Wife failed to establish donative intent or delivery and, consequently, failed to prove that Husband made a gift to Wife of the interest in the LLC. Rather, Husband asserts that the record shows that he only included Wife's name in the LLC documents because of advice from counsel that two persons were required to be listed to form an LLC. Additionally, Husband notes that he has always been listed on tax documents as one-hundred (100%) percent owner of S.G. Communications. Notwithstanding both parties' characterizations of the ownership of S.G. Communications, again the record shows that Husband acquired this enterprise during the parties' marriage. Contrary to Wife's contention, we cannot conclude that Husband intended to transfer to Wife by gift a 25% interest in the LLC. The burden of proving a gift rests with the party claiming the gift. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998). From a review of the record, we conclude that the evidence does not preponderate against the trial court's implicit finding that Wife's 25% ownership interest in S.G. Communications was not a gift and not the separate property of Wife. Rather, the record supports

the trial court's determination that S.G. Communications in its entirety was marital property and properly included in the marital estate.[7]

With respect to the trial court's distribution of marital property, Wife asserts that the trial court's division was demonstrably inequitable, such that it was an abuse of discretion. Wife argues that a number of the factors considered in the division of the marital estate weigh heavily in her favor. The parties were married for virtually all of their adult lives, and, with the exception of a few parcels of land, the parties acquired all of their property during the marriage. The parties are relatively young and in good health, but Wife contends that Husband has far more vocational skills, a much higher earning capacity, and a greater ability to acquire future capital assets than Wife. Wife also points out that the trial court awarded Husband the entirety of his business interests, including the vast majority of the parties' real property holdings. Wife argues that the trial court's division of the marital estate, which Wife claims resulted in Husband receiving over ninety (90%) percent of the value of the parties' property, was inequitable and not supported by a preponderance of the evidence.

---

[7]Just prior to oral argument in this matter, Husband filed, in accordance with Rule 14(c) of the Tennessee Rules of Appellate Procedure, a Motion for Consideration of Post-Judgment Facts. In this motion, Husband asserted that the value of S.G. Communications has dramatically diminished in value, due to the fact that the envisioned sale of the radio station has fallen through and Husband has been forced to enter into litigation over the matter. At the time of trial, both parties agreed and the trial court so valued S.G. Communications at $1,850,000.00. Husband contends in his motion that the current value of the radio station is as little as $250,000.00, based upon lost advertising revenue, risk of losing the FCC license or receiving fines by the FCC, and damage to the equipment caused by the proposed purchasers of the radio station.

Simply because Husband is involved in litigation over the sale of S.G. Communications does not require this Court to accept as true his claim that the radio station should be valued at $250,000.00. Further, "Tennessee Rule of Appellate Procedure 14 may not be used to relitigate the value of an asset, even if that value has changed." *Wade v. Wade*, 897 S.W.2d 702, 722 (Tenn. Ct. App. 1994) (citing *Duncan v. Duncan*, 672 S.W.2d 765, 768 (Tenn. 1984)). Therefore, Husband's motion was denied, and we will not consider the fact that he is currently involved in litigation over the sale of S.G. Communications.

Tennessee follows the principle of equitable distribution of marital property. *See* Tenn. Code Ann. § 36-4-121. Only marital property is subject to equitable division, and an "equitable" division does not necessarily require an "equal" split. *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988); *Powell v. Powell*, 124 S.W.3d 100, 107 (Tenn. Ct. App. 2003). Like marital property, marital debt is also subject to equitable division. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). In making an equitable distribution, the trial court's determination is not guided by legal title. *See* Tenn. Code Ann. § 36-4-121(a)(3) (2001); *Langford v. Langford*, 421 S.W.2d 632, 634 (Tenn. 1967). Rather, the trial court must consider all relevant factors including those statutory factors set forth in section 36-4-121(c) of the Tennessee Code. Tenn. Code Ann. § 36-4-121(c); *Denton v. Denton*, 902 S.w.2d 930, 932 (Tenn. Ct. App. 1995). The trial court's determinations of marital property and the equitable division of that property are questions of fact. *Powell*, 124 S.W.2d at 103. In this context, trial courts are given broad discretion, and a "trial court's division of the marital estate is entitled to great weight on appeal." *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988) (citing *Edwards v. Edwards*, 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973)). We will presume the trial court's division of marital property to be correct unless the evidence preponderates otherwise. *Id.*; *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987).

Although Wife contends that the trial court's division resulted in Husband receiving over 90% of the marital estate, after a review of the record, we do not completely agree with Wife's statement regarding the percentage division of the marital property. The trial court valued the total marital estate at $4,121,500.00. As the bulk of her distribution, Wife received the marital residence and household furnishings, valued after debt at approximately $200,000.00. Wife also received a

vehicle valued at $8,000.00 after debt. In addition, Wife received a life estate income interest in a trust valued at $600,000.00. Therefore, Wife's portion of the marital property is worth approximately $800,000.00. Husband received the remainder of the marital estate, valued at approximately $3,321,500.00. Thus, Husband received approximately eighty (80%) percent of the marital estate, in contrast to Wife's approximate twenty (20%) percent.

Section 36-4-121(f)(1) of the Tennessee Code authorizes the trial court to make a distributive award of money or other property to one spouse in order to facilitate a distribution of marital property or when the court determines that the distribution of an interest in a business, corporation, or profession would be contrary to law. Tenn. Code Ann. § 36-4-121(f)(1) (2001). However, this distributive award of money should be designed "to achieve equity between the parties." *See id.* Although there is case law which provides that a court may award a life estate as part of a property division, we have found no authority which allows the trial court to create a trust where Wife is only entitled to an income interest. *See Barnhill v. Barnhill*, 826 S.W.2d 443, 451 (Tenn. Ct. App. 1991). In addition, the trial court has provided no basis for the establishment of the trust and there is no issue as to the competency of Wife. Further, by designating that, upon Wife's death "the corpus of the trust shall be divided equally between the parties' children," the trial court has effectively written a will for Wife. *See Allison v. Allison*, 638 S.W.2d 394, (Tenn. Ct. App. 1982) (stating that trial judge has no authority to make a will for a party under the property division statutes). Rather than awarding Wife a distributive award of money in the form of an income interest in a trust, we believe the trial court should have awarded Wife an outright distribution.

Moreover, after reviewing the record and in light of the unique facts of this case, we conclude that the trial court's division of the marital estate in this case was inequitable. The record reflects that Wife has no more than a sixth grade education and does not speak the English language very well. Additionally, coupled with her lack of vocational skills, because she has spent virtually the entire period of her adult, married life as a homemaker, she has little prospect of improving her financial status beyond what is provided to her in this matter. The record further indicates that Wife has made significant contributions to the marriage in her capacity as homemaker and parent of the parties' four children. In contrast, Husband retains the educational background and financial wherewithal to continue to improve his income in the future. He holds a post-graduate level of education and continues to have numerous viable business interests. The record clearly shows that the parties began this marriage with very little assets and accumulated the vast majority of their wealth during the marriage. In light of the duration of the marriage and the parties' respective capacity to improve themselves financially, we simply cannot hold that the trial court's division of the marital estate, which awarded Husband property worth approximately 3.3 million dollars and Wife property worth approximately $800,000, was equitable. Therefore, we believe that in order to achieve an equitable distribution of the marital property, Wife should be awarded marital property valued at $1,500,000. We agree with the trial court that Wife should be awarded the marital home at Buckingham Place, the household furnishings located therein, and the 1999 Toyota Sienna Van. The trial court determined that the marital residence had equity of $175,000, equity in the van of $8,000, and household furnishings were valued at $25,000.

The trial court ordered Husband to pay Wife the sum of $50,000 directly within thirty days from the entry of the decree. If that amount has not been paid, Husband shall do so immediately. In view of the fact that the distribution of marital property, as modified, may require liquidation of assets, and the fact that business decisions may dictate which properties are the better candidate for liquidation, we deem it necessary to remand this matter to the trial court to construct an equitable distribution of marital property in accordance with this Court's modification. The trial court on remand may hear additional evidence limited to the issue of how the marital property shall be distributed in order to reach the result set forth hereinabove. Ordinarily, when modifying a trial court's distribution of marital property, this Court would designate the manner in which the property is to be distributed. However, in the present case there appears to be little or no liquid assets. Although there was testimony concerning certain bank accounts, the trial court's decree does not mention them, nor do the parties' briefs filed in this Court. The equity in the marital residence, the household furnishings, equity in the van, and the $50,000 cash total $258,000. Therefore, Husband may elect to pay Wife the sum of $1,242,000. In that event, Husband shall receive the remainder of the marital property, less that awarded to Wife as set forth hereinabove.

Finally, Husband contends that the trial court's creation of the trust was an impermissible award of alimony *in futuro*. Without belaboring the point, the creation of the trust was mentioned in the section of the divorce decree entitled "Property Settlement" and was made in the context of the distribution of the parties' property. There is nothing to indicate that the trial court was ordering alimony or that it even addressed alimony. Moreover, our above conclusion essentially renders moot Husband's argument on this issue.

## C. Child Support

In the divorce decree, the trial court found that Husband's average monthly income was $10,176.50. Based upon this figure, the trial court set Husband's child support obligation at $3,355.00 per month. Wife contends that the trial court erred by failing to consider the retained earnings in Husband's various corporations and not imputing those amounts to Husband as income for child support purposes. *See Wills v. Wills*, No. M2002-02167-COA-R3-CV, 2003 WL 22209357, at *2 (Tenn. Ct. App. Sep. 25, 2003) (*no perm. app. filed*). Additionally, Wife argues that the trial court did not account for a $100,000.00 option payment Husband received for the purchase of S.G. Communications, as well as $7,500 per month in rental income Husband received through S.G. Communications. Consequently, Wife contends that Husband's average monthly income is more accurately $16,000.00, and "the appropriate support level is 'off the chart' – exceeding $4,621 per month."

The child support guidelines in effect at the time of this hearing, August of 2003, provided that "where the net income of the obligor parent exceeds $10,000 per month, the custodial parent must prove by a preponderance of the evidence that child support based on income amounts in excess of $10,000 per month is *reasonably necessary* to provide for the needs of the minor child(ren)." *Redmond v. Hunt*, No. W2004-00127-COA-R3-JV, 2004 WL 2848385, at *3 (Tenn. Ct. App. Dec. 10, 2004) (*no perm. app. filed*) (emphasis added) (citing Tenn. Code Ann. § 36-5-101(e)(1)(B)(2001) and Tenn. Comp. R. & Regs. 1240-2-4-.04(3)). Therefore, under the guidelines, Wife had the burden of establishing that support amounts above the statutory cap were

reasonably necessary to provide for the needs of the parties' children. Although Wife directs our attention to the fact that Husband's average monthly income may indeed be in excess of $10,000.00, there is no evidence that child support based on income amounts above the cap is reasonably necessary to provide for the needs of the parties' children. Nor does the record demonstrate that Wife advanced this argument in the trial court. Accordingly, we find this issue to be without merit.

### D.  Discretionary Costs

The trial court awarded Wife a total of $14,583.00 as discretionary costs in this matter. Husband appeals this award and argues that only a prevailing party is entitled to discretionary costs under rule 54.04 of the Tennessee Rules of Civil Procedure. As Husband's argument goes, Wife may not be the prevailing party and is, therefore, not entitled to discretionary costs.

"Pursuant to rule 54.04, trial courts are vested with wide discretion in awarding discretionary costs, and this court will not interfere with such an award except upon an affirmative showing that the trial court abused its discretion." *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998) (citing *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992); *In re McCoy*, No. 03A01-9604-CH-00143, 1996 WL 599703, at *7 (Tenn. Ct. App. Oct. 21, 1996), *perm. app. denied* (Tenn. Apr. 7, 1997); *Ashford v. Benjamin*, No. 02A01-9311-CV-00243, 1994 WL 677607, at *2 (Tenn. Ct. App. Dec.6, 1994) (*no perm. app. filed*); *Faux v. Spears*, No. 03A01-9312-CV-00433, 1994 WL 147830, at *2 (Tenn. Ct. App. Apr.26, 1994) (*no perm. app. filed*)). Although generally the trial court will award discretionary costs to the prevailing party upon a proper application, "trial

courts are free to apportion costs between the litigants as the equities of each case demand." *Id.* On appeal, the appellant bears the burden of showing that no equitable basis supports the trial court's apportionment of costs. *See id.*

In this case, Husband relies simply on the argument that Wife cannot be the prevailing party because she is not entitled to any relief. However, it appears to us that Wife was the prevailing party at trial and in this Court. Further, Husband has failed to carry his burden of showing an abuse of discretion on the part of the trial court. Therefore, in light of the equities in this case, we cannot say that the trial court abused its discretion in awarding Wife her discretionary costs.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court as modified. Costs of this appeal are taxed equally between the Appellant Himelda Fuentes Guzman, and her surety and the Appellee, Salvador Guzman Alvares, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE